## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ANIMAL LEGAL DEFENSE FUND,

          *Plaintiff*,

    v.

BROOKE ROLLINS, in her official capacity, Secretary, United States Department of Agriculture, *et al*.,[1]

          *Defendants*.

Civil Action No. 22-3146 (RDM)

## <u>MEMORANDUM OPINION</u>

The Animal Legal Defense Fund ("ALDF" or "Fund") brings this suit against the United States Department of Agriculture, the Secretary of Agriculture, the Animal and Plant Health Inspection Service ("APHIS"), and the APHIS Administrator (collectively, "USDA" or "Department") under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the Animal Welfare Act ("AWA"), 7 U.S.C. § 2131 *et seq.* Under the AWA, the Department promulgates standards for the humane treatment of animals, *id.* § 2143, and carries out "inspections as [it] deems necessary, to determine whether any dealer, exhibitor, immediate handler," or other regulated party "has violated or is violating any provision of" the AWA or its implementing regulations, *id.* § 2146(a). The statute also directs the Department to promulgate regulations "to permit inspectors to confiscate or destroy in a humane manner any animal found to be suffering as a result of a failure to comply with any provision of this chapter or any regulation or standard issued thereunder." *Id.*; *see* 9 C.F.R. § 2.129. The existing implementing

---

[1] The Court automatically substitutes the current public officer in the case caption. *See* Fed. R. Civ. P. 25(d).

regulations, in turn, permit—but do not require—inspectors to confiscate animals held by an exhibitor, if (1) an APHIS official finds that the animals are "suffering as a result of the failure of the . . . exhibitor . . . to comply with" the regulations, and (2) the exhibitor fails to take corrective action after the official "make[s] a reasonable effort to notify the . . . exhibitor" of the violation and "request[s] that the condition be corrected and that adequate care be given" to the animals.  9 C.F.R. § 2.129(a).

In July 2016, the ALDF submitted a petition for rulemaking requesting that the USDA amend its regulations to permit, among other things, the confiscation of animals upon the initiation of an enforcement proceeding or the termination of any license.  Dkt. 35 at 8–9.  The Department rejected the petition, expressing doubt that the USDA had the statutory authority to confiscate animals without a prior finding that the animals were suffering due to a violation of the AWA or its implementing regulations and observing that, in any event, the petition "relie[d] heavily on outdated data and [USDA] practices that [were] no longer utilized since the petition was filed."  *Id.* at 125–27.  The ALDF then filed this suit, alleging that the denial of the petition was arbitrary, capricious, and not in accordance with law in violation of the APA.  Dkt. 1 at 34 (Compl. ¶¶ 129–30).

Now pending before the Court are the ALDF's motion for summary judgment, Dkt. 27, and the USDA's cross-motion for summary judgment, Dkt. 28.  Because the ALDF lacks Article III standing, the Court will **DENY** the ALDF's motion and will **GRANT** the USDA's cross-motion.

## I. BACKGROUND

### A.    Statutory and Regulatory Background

Congress enacted the AWA "to insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment,"

specifically finding that it was "essential to regulate" their "transportation, purchase, sale, housing, care, handling, and treatment."  7 U.S.C. § 2131.  Many of the statute's provisions are implemented by the APHIS, a component of the Department of Agriculture.  *See* 7 C.F.R. § 2.80(a)(6).  The APHIS "establishes acceptable standards of humane care and treatment for regulated animals and monitors and achieves compliance through inspections, enforcement, education, and cooperative efforts."  *Id.* § 371.7(a).  Regulated animal dealers and exhibitors must apply for licenses from the USDA, and "no such license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by [the Department]."  7 U.S.C. § 2133.  The USDA also carries out inspections "to determine whether any [regulated party] has violated or is violating any provision" of the statute or its implementing regulations.  *Id.* § 2146(a).

This case centers on the Department's authority to confiscate animals from regulated parties who fail to fulfill their legal obligations.  The AWA decrees that the Department "shall promulgate such rules and regulations as [it] deems necessary to permit inspectors to confiscate or destroy in a humane manner any animal found to be suffering as a result of a failure to comply with any provision of this chapter or any regulation or standard issued thereunder."  *Id.*  In accordance with that directive, the USDA has issued regulations specifying when such confiscations (or destructions) may occur.  If an APHIS official finds that an animal held by a regulated party is "suffering as a result of the failure of the [regulated party] to comply with any provision of the regulations or the standards set forth in this subchapter," the official must first "make a reasonable effort" to notify that party of the animal's condition and "request that the condition be corrected and that adequate care be given . . . or that the animal[] be destroyed by euthanasia."  9 C.F.R. § 2.129(a).  If the regulated party does not comply, "the APHIS official

may confiscate the animal[] for care, treatment, or disposal . . . if, in the opinion of [the APHIS], the circumstances indicate the animal's health is in danger." *Id.*  In the event that the regulated party cannot be located, the official "shall provide for adequate care when necessary to alleviate the animal's suffering," and "[i]f in the opinion of [the APHIS], the condition of the animal[] cannot be corrected by this temporary care, the APHIS official shall confiscate the animal[]." *Id.* § 2.129(b).  Confiscated animals may be placed with other persons or facilities able to provide the necessary standard of care, or euthanized. *Id.* § 2.129(c).

## B.    Procedural History

The ALDF, a nonprofit organization that works to protect animals through the legal system, filed a petition for rulemaking with the Department on July 19, 2016.  Dkt. 35 at 1, 4. The petition posited that the existing USDA regulations—which, as discussed above, require that regulated parties be given an opportunity to correct conditions causing animal suffering before an animal is confiscated, 9 C.F.R. § 2.129(a)—fail adequately to protect animals.  Dkt. 35 at 3. The petition relied, in part, on a 2010 USDA Office of the Inspector General Report, which raised concerns that APHIS officials were failing to timely confiscate animals found to be suffering in unlawful conditions.  *Id.* at 5–6 (citing *Animal and Plant Health Inspection Service Animal Care Program Inspections of Problematic Dealers*, U.S. Department of Agriculture, Office of Inspector General (May 2010), *available at* https://perma.cc/B7TR-4YBB).  The petition also discussed the case of Cricket Hollow Zoo, an animal exhibitor in Iowa whose license was suspended by the APHIS "in the wake of a series of inspection reports showing repeated violations of the AWA." *Id.* at 7.  Because the Department elected not to confiscate many of Cricket Hollow's animals, they continued to languish in subpar conditions until private litigation forced the zoo to close. *Id.*

4

The ALDF's petition requested that the USDA amend 9 C.F.R. § 2.12 to include the following language:

(a) A license may be terminated during the license renewal process or at any other time for any reason that an initial license application may be denied pursuant to §2.11 after a hearing in accordance with the applicable rules of practice.

(b) Upon initiation of an enforcement proceeding that could result in license revocation or suspension, or upon the relinquishment, suspension, or termination of a license for any reason, an APHIS official may confiscate the animal(s) for care, treatment, or disposal and place the animal(s) with persons or facilities, such as a non-for-profit animal sanctuary, that can offer a level of care equal to or exceeding the regulatory standards, as determined by [the] APHIS, even if the persons or facilities are not licensed by or registered with [the] APHIS.

   (1) Whenever an officer authorized under this section seizes or impounds an animal based on a reasonable belief that prompt action is required to protect the health or safety of the animal or the health or safety of others, the officer shall provide the owner or keeper of the animal, if known or ascertainable after reasonable investigation, with the opportunity for a postseizure hearing to determine the validity of the seizure or impoundment, or both.

   (2) Failure of the owner or keeper, or his or her agent, to request or to attend a scheduled hearing shall result in a forfeiture of any right to a preseizure hearing or right to challenge his or her liability for costs incurred pursuant to this section.

   (3) The hearing officer, after the hearing, may affirm or deny the owner's or keeper's right to custody of the animal and, if reasonable grounds are established, may order the seizure or impoundment of the animal for care and treatment.

   (4) The full cost of caring for and treating any animal properly seized under this subdivision shall constitute a lien on the animal, and the animal shall not be returned to its owner until the charges are paid if the seizure is upheld pursuant to this section.

   (5) If the animal requires veterinary care and the impounding agency is not assured, within 14 days of the seizure of the animal, that the

> owner will provide the necessary care, the animal shall not be returned to its owner and shall be deemed to have been abandoned.
>
> (c) Interested persons who do not have a possessory or ownership right in the animal may intervene in the administrative license revocation process on behalf of the animals if the USDA begins the revocation process without seizing the mistreated animals.
>
> (d) The provisions of this section shall serve as a condition to the granting of any new AWA license.

Dkt. 35 at 8–9.

The petition identified two potential statutory authorities for the proposed expanded confiscatory powers. First, the ALDF pointed to the language in 7 U.S.C. § 2146(a) directing the Department to "promulgate such rules and regulations as [it] deems necessary to permit inspectors to confiscate or destroy in a humane manner any animal found to be suffering as a result of a failure to comply with any provision of this chapter or any regulation or standard issued thereunder." *Id.* at 4. Second, the ALDF noted that a separate provision of the AWA broadly empowers the USDA to "promulgate such rules, regulations, and orders as [it] may deem necessary in order to effectuate the purposes" of the statute. *Id.* (quoting 7 U.S.C. § 2151).

The USDA failed to respond to the petition for several years, eventually prompting the ALDF to file a civil action in this Court in 2022 seeking to compel agency action "unreasonably delayed" in violation of the APA. *ALDF v. Vilsack*, No. 22-133 (D.D.C. Jan. 20, 2022), Dkt. 1 at 15 (Compl. ¶¶ 60–62). A few months after the initiation of that case, the USDA issued a letter denying the petition, Dkt. 35 at 125–29, at which point the ALDF voluntarily dismissed the unreasonable delay suit. *ALDF v. Vilsack*, No. 22-133 (D.D.C. Apr. 22, 2022), Dkt. 14.

In the denial letter, the Department first concluded that the proposed regulation was "divorced from" the USDA's statutory authority under 7 U.S.C. § 2146(a). Dkt. 35 at 126. Section 2146(a) refers only to the confiscation of an animal that is "found to be suffering," while

the ALDF's proposed amendment "provide[d] that [the] APHIS may confiscate an animal upon the initiation of any enforcement proceeding," even when the proceeding raises "issues that may be unrelated to the welfare of animals." *Id.* The USDA was further concerned that the ALDF's proposal appeared to contemplate a post-confiscation hearing exclusively in the event of a seizure related to the health or safety of animals, which "raise[d] significant questions about when a hearing would be provided in situations that do not implicate health or safety." *Id.* at 126–27. In a footnote, the USDA also expressed skepticism that the AWA's general grant of regulatory authority "in order to effectuate the purposes of" the statute, 7 U.S.C. § 2151, could be read to authorize the issuance of regulations permitting animal confiscations even without a prior finding of suffering. As the Department explained, "the AWA also contains a specific grant of authority pertaining expressly to confiscation of animals" in Section 2146(a), and "[t]he more specific part of the statute, which ties confiscation to the health and safety of animals by requiring them to be 'suffering,' governs [the] APHIS'[s] legal authority to confiscate." Dkt. 35 at 126 n.1.

The denial letter went on to emphasize that Department officials already "can and do continue to inspect the animals" after an enforcement proceeding has been initiated, which can result in confiscations if suffering is found, and it criticized the petition for "rel[ying] heavily on outdated data and APHIS practices that are no longer utilized." *Id.* at 127. The letter emphasized, moreover, that "each of the[] incidents mentioned [in the petition] involve[d] animal suffering, and in those circumstances, [the] APHIS already has the statutory and regulatory authority to confiscate the animals at issue." *Id.* The Department thus understood the petition as not focusing on "the need for additional statutory authority, but," rather, on when "[the] APHIS should exercise its existing authority." *Id.* On that subject, the USDA noted recent changes to

7

its licensing procedures "to reflect more stringent standards" on regulated parties, including a new "requirement that applicants demonstrate to [the] APHIS that they are complying with the AWA" rather than self-certifying.  *Id.*

Finally, the USDA explained that "[e]ven if these regulations were warranted," their adoption at that time would not "be the best use of [the] APHIS'[s] limited resources" given the Department's "focus on animal 'suffering'" and its prioritization of "animals that are directly at risk of harm."  *Id.* at 129.  Expanding confiscations to "any license proceeding" risked "a dramatic expansion in administrative proceedings" and "could also lead to additional litigation about [the] APHIS's ability to confiscate animals even when those animals are not suffering." *Id.*  Therefore, "[the] APHIS believe[d] it [was] a better use of its time and resources to focus its confiscation efforts on the animals most in need." [2]  *Id.*

After the USDA denied the ALDF's petition, the organization filed this suit alleging that the denial was "both 'arbitrary and capricious' and 'not in accordance with law' in violation of the APA."  Dkt. 1 at 34 (Compl. ¶¶ 129–30) (quoting 5 U.S.C. § 706(2)(A)).  The ALDF requests, among other things, that the Court issue declaratory relief that the Department "ha[d] the statutory authority to promulgate regulations providing for confiscation of animals who are at direct risk of suffering," set aside the denial of the petition, and award the ALDF attorney's fees and other costs.  *Id.* at 35. (Compl.).  After the USDA certified the Administrative Record, the ALDF moved to supplement the record with additional materials.  Dkt. 19.  The Court denied that motion at a hearing held in February 2024.  Min. Entry (Feb. 16, 2024).

_____

[2] In separate portions of the letter, the USDA also discussed and rejected the ALDF's proposals related to allowing third-party intervention in revocation actions and requiring compliance with the offered amendments as a condition of license renewal.  Dkt. 35 at 127–29.  The ALDF has not sought judicial review of those portions of the agency's decision.  Dkt. 27 at 17 n.3; Dkt. 28 at 20 n.4.

The ALDF then moved for summary judgment, Dkt. 27, and the USDA filed its own cross-motion for summary judgment, Dkt. 28. Those motions are now before the Court.

## II. LEGAL STANDARD

In general, Federal Rule of Civil Procedure 56 authorizes a federal district court to enter summary judgment when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In a case involving review of a final agency action under the [APA], however, the standard set forth in Rule 56(a) does not apply because of the limited role of a court in reviewing the administrative record." *Kadi v. Geithner*, 42 F. Supp. 3d 1, 8 (D.D.C. 2012) (citation omitted). In the unique context of a case brought under the APA, the district court "sit[s] as an appellate tribunal," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222 (D.C. Cir. 1993), to decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review," *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011).

"When it comes to standing, however, district courts are not limited to the administrative record." *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 187 (D.D.C. 2022). A "plaintiff bears the burden of . . . establishing the elements of standing," and "each element of standing must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citation omitted and formatting altered). When a defendant moves for summary judgment on the issue of standing, it must demonstrate "that there is no genuine dispute as to any material fact," Fed. R. Civ. P. 56(a), and that the plaintiff cannot establish the required elements of Article III standing based on the

undisputed evidence, *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). The plaintiff may

not rest on the mere allegations of the complaint but must, instead, "cit[e] to particular parts of

materials in the record," Fed. R. Civ. P. 56(c), that demonstrate the existence of "a concrete and

particularized injury in fact that is fairly traceable to the challenged action of the defendant and

likely to be redressed by a favorable judicial decision," *Lexmark Int'l, Inc. v. Static Control

Components, Inc.*, 572 U.S. 118, 125 (2014) (citation omitted). "The evidence of the non-

movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v.

Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144,

158–59 (1970)).

### III. ANALYSIS

The Court's analysis begins, and ends, with the familiar question of standing. Article III

of the Constitution limits the judicial power to individual "Cases" and "Controversies," Art. III

§ 2 cl. 1, and "a proper case or controversy requires at least one plaintiff to demonstrate that she

has standing to sue," *Ctr. for Biological Diversity v. Dep't of Interior*, 144 F.4th 296, 304 (D.C.

Cir. 2025) ("*CBD v. DOI*"). To do so, the plaintiff must establish (1) that it has or will

imminently suffer an injury in fact; (2) that this injury is fairly traceable to the challenged

conduct of the defendant; and (3) that it is likely that this injury will be redressed by a favorable

judicial decision. *See Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017).

When, as here, an organization such as the ALDF "seeks to invoke the jurisdiction of a

federal court, it can establish standing in one of two ways." *Buffalo Field Campaign v. Williams*,

579 F. Supp. 3d 186, 195 (D.D.C. 2022). First, the organization may "assert 'associational

standing' to sue on behalf of its members." *Id*. (citing *Hunt v. Wash. State Apple Advert.

Comm'n*, 432 U.S. 333, 343 (1977)). Second, the organization may "assert 'organizational

standing' to sue on its own behalf." *Id.* (citing *People for the Ethical Treatment of Animals v. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) ("*PETA*")).  The ALDF makes both arguments in this case but falls short on each.

## A.    Associational Standing

The ALDF first claims associational standing on behalf of its members.  Dkt. 27 at 18. To establish associational standing, a plaintiff-organization must demonstrate (1) that it has at least one member who has standing to sue in his or her own right, (2) that the interests that the organization seeks to protect are germane to its organizational purposes, and (3) that the organization's members are not required to participate individually in the lawsuit.  *See Hunt*, 432 U.S. at 343.  Here, the ALDF's claim of associational standing falters at the first step; it has failed to identify any member with Article III standing to challenge the USDA's denial of the petition.

As noted above, there are three "irreducible" requirements of Article III standing.  First, the individual must "have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical.'"  *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).  Second, the plaintiff must establish "a causal connection between th[at] injury and the conduct complained of," such that the injury is "fairly . . . trace[able] to the challenged action of the defendant."  *Id* (citation omitted).  Finally, the plaintiff must also show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Id.* at 561 (internal quotation marks and citation omitted).  Because the ALDF seeks only prospective declaratory and injunctive relief in this case—forcing the reconsideration of a rulemaking petition that, if adopted, might affect future ALDF enforcement actions, Dkt. 1 at 35 (Compl.)— rather than compensation for any previous harm suffered, "past injuries alone are insufficient to

establish standing," *Dearth v. Holder*, 641 F.3d 499, 501 (D.C. Cir. 2011).  Instead, the ALDF

members must show that they are "suffering an ongoing injury or face[] an immediate threat of

injury." *Id.*

To support its assertion of associational standing, the ALDF has proffered ten

declarations from its members detailing a variety of asserted harms.  None, however,

demonstrate a qualifying injury, traceable to the denial of the ALDF's petition, that might be

redressed by a favorable decision in this case.

1.    *Injury in Fact*

The declarations submitted by the ALDF members detail previous aesthetic or emotional

injuries stemming from seeing animals held in abusive conditions by USDA-regulated entities.

For example, sisters Tracey and Lisa Kuehl visited Cricket Hollow Zoo in Iowa and were

"appalled and disgusted" to see animals in "dangerous" conditions, kept in "tiny, filthy

enclosure[s], filled with piles of excrement" that "bordered on animal abuse."  Dkt. 27-1 at 2–3

(T. Kuehl Decl. ¶¶ 5, 7); Dkt. 27-3 at 6 (L. Kuehl Decl. ¶ 12).  Michelle Andrews, Carolyn Long,

and Carol and Scott McGee visited the Olympic Game Farm in Washington State, where they

observed animals in "terrible" and "absolutely horrendous" circumstances, kept in "desolate

enclosures" and other "unnatural conditions."  Dkt. 27-6 at 3 (Andrews Decl. ¶ 9); Dkt. 27-9 at 4

(Long Decl. ¶ 10); Dkt. 27-7 at 4 (C. McGee Decl. ¶ 12); Dkt. 27-8 at 5 (S. McGee Decl. ¶ 13).

Arielle Carlisle, Tim Gano, and Whitney Barlow previously worked at Tiger Creek in Texas,

where they witnessed animals receiving "inadequate care," including suffering injuries for which

the facility's owners failed to seek proper veterinary treatment.  Dkt. 27-10 at 7–8 (Carlisle Decl.

¶¶ 31–34); Dkt. 27-11 at 11–16 (Gano Decl. ¶¶ 43–50); Dkt. 27-12 at 7–9 (Barlow Decl. ¶¶ 24–

31).  Kelly Bennett visited Farmers Inn in Pennsylvania and saw animals suffering from a similar

variety of abusive conditions.  Dkt. 27-13 at 4–6 (Bennett Decl. ¶¶ 13–22).

Those declarations more than suffice to establish the distress felt by the ALDF members upon observing animals being kept in inadequate conditions. The D.C. Circuit has held that "an aesthetic interest in seeing exotic animals living in a nurturing habitat" that is "injured" upon "witness[ing] the actual living conditions of the [animals] described and named in [an] affidavit" qualifies as an injury in fact that can support standing. *ALDF v. Glickman*, 154 F.3d 426, 432 (D.C. Cir. 1998) (en banc). It is less apparent whether all the aesthetic injuries discussed in the declarations are "ongoing" or otherwise constitute an "immediate" threat, as is required to seek prospective relief. *See Dearth*, 641 F.3d at 501. For example, it is undisputed that Cricket Hollow Zoo's operations have been terminated by court order and that the facility has lost its USDA license. Dkt. 27 at 14 and n.2 ("The court enjoined the [zoo operators] from owning exotic animals and wildlife and ordered rehoming the animals at sanctuary."). It is therefore doubtful that the Kuehls are still suffering any harm to their aesthetic interests caused by that facility's mistreatment of animals. Tracy Kuehl does attest to a desire to visit animals rescued from Cricket Hollow at an animal sanctuary in Colorado but does not suggest that doing so will result in any aesthetic injury—to the contrary, she states that she "look[s] forward" to the experience. Dkt. 27-1 at 14–15 (T. Kuehl Decl. ¶ 34).

The other declarants, however, do assert a desire to return to the animals/locations at issue, if their conditions were to improve. *See, e.g.*, Dkt. 27-6 at 4 (Andrews Decl. ¶ 14) ("I would gladly visit the animals [at Olympic Game Farm] again if they were given more space and had significantly improved shelter and habitat because I want to see them happy and thriving."); Dkt. 27-10 at 35 (Carlisle Decl. ¶ 149) ("I fully intend to return to visit the animals at Tiger Creek . . . when their conditions improve or they are transferred to an appropriate sanctuary."). In *American Society for the Prevention of Cruelty to Animals v. Ringling Bros.*, 317 F.3d 334

(D.C. Cir. 2003), the circuit held that someone who would "like to visit" animals, "but is unwilling to do so because he would suffer 'aesthetic and emotional injury' from seeing the animals unless they are placed in a different setting or are no longer mistreated," suffers a qualifying injury in fact, *id.* at 335–36. The Court, accordingly, concludes that the ALDF has demonstrated that at least one member can satisfy the injury-in-fact prong of the standing inquiry.

    2.    *Causation and Redressability*

    The ALDF, however, fails to clear the next two hurdles. As a "plaintiff [whose] asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*," the Fund must demonstrate "much more" to obtain standing than a party whose own primary conduct is governed by the regulations at issue. *Lujan*, 504 U.S. at 562 (emphasis in original). The ALDF has not met that burden here for two reasons. First, the record does not establish that any of the declarants' aesthetic injuries are "fairly traceable" to the USDA's rejection of the ALDF's petition, and, second, the record fails to offer any non-speculative basis to conclude that a favorable decision would redress these injuries. *See id.* at 560–61.

    The ALDF asserts that it has standing because "a favorable decision here would substantially expand circumstances where [the] USDA may confiscate animals from inhumane conditions, redressing [the] ALDF's members' aesthetic injuries." Dkt. 27 at 20. That brief summation of the ALDF's theory of this case understates the complexity of what would be required for the Court's decision to result in any amelioration of an asserted aesthetic injury. The ALDF's proposed regulatory amendments would give the USDA the option—but not the obligation—to confiscate animals "[u]pon initiation of an enforcement proceeding that could result in license revocation or suspension, or upon the relinquishment, suspension, or termination of a license for any reason." Dkt. 35 at 8. Consider what would be required for that policy to

redress the aesthetic injuries of, for example, ALDF member Arielle Carlisle, who "intend[s] to return to visit the animals at Tiger Creek . . . when their conditions improve or they are transferred to an appropriate sanctuary." Dkt. 27-10 at 35 (Carlisle Decl. ¶ 149). One possibility is that the expanded confiscation authority might spur Tiger Creek into voluntarily improving the quality of its facilities in order to forestall confiscations. But there is no evident reason to expect that to happen, since the ALDF's proposed rule would not change the substantive standards governing acceptable conditions for the care of animals, and the USDA already has authority to enforce those requirements (including by confiscation) against actors who, like Tiger Creek, fail to correct those conditions that the APHIS finds are causing suffering in violation of the AWA.

For the injury to be redressed under the ALDF's theory of the case, the USDA would need (1) to elect (as a matter of the agency's enforcement discretion) to bring "an enforcement proceeding that could result in license revocation or suspension" against Tiger Creek, Dkt. 35 at 8, or otherwise deprive the facility of its license, (2) to elect (as a matter of its remedial discretion) to confiscate animals at Tiger Creek pursuant to its expanded authority to do so without a prior finding of unlawful suffering, and (3) to relocate (as a matter of its administrative discretion) the animals to a facility where Carlisle might be able to travel to observe them. The Court agrees with the USDA that such a sequence is "entirely speculative," and insufficient for standing. Dkt. 32 at 4.

The first problem for the ALDF is that any redress of its members' injuries is premised on the government's hypothetical decision to enforce the law against the facilities named in the declarations; it will do the ALDF members no good if the USDA elects, instead, to confiscate animals from other facilities that they have never visited or simply declines to bring any additional enforcement actions in the first place. In *United States v. Texas*, 599 U.S. 670 (2023),

the Supreme Court held that two state plaintiffs lacked standing in a suit intended to spur the federal government to "alter its arrest policy so that the [Department of Homeland Security] arrests *more* noncitizens," *id.* at 676 (emphasis in original).  As the Court cautioned, "federal courts have not traditionally entertained lawsuits of this kind," which in essence rest on a desire to force the government to "make[] more arrests or [to] initiate[] more prosecutions."  *Id.* at 677–78; *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) ("[I]n American jurisprudence at least, a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.").

The ALDF's suit here rests on just such a theory; the Fund seeks to have the USDA enforce animal welfare regulations against specific named violators whose activities have caused its members harm. Dkt. 30 at 11 ("[A] favorable judicial decision here will 'prompt' [the] USDA to confiscate animals to whom ALDF members have aesthetic connections." (citation omitted)).  Assuming that the nature of the relief sought does not automatically doom the ALDF's attempt to demonstrate standing, any relief would nonetheless depend on the Department choosing to exercise its presumptively unreviewable enforcement discretion in a particular manner.  *See Heckler v. Chaney*, 470 U.S. 821, 831 (1985); *see also Texas*, 599 U.S. at 678–79 (explaining that "the Executive Branch possesses authority to decide how to prioritize and how aggressively to pursue legal actions against defendants who violate the law . . . not the Judiciary" and collecting supporting authorities (citation omitted)).  The ALDF's premise that expanding the scope of enforcement remedies *available to* the USDA would result in the Department *choosing to* exercise that discretion against the specific facilities named in its members' declarations is wholly speculative and does not, by any stretch, establish that its members' injuries are "likely to be redressed by a favorable judicial decision."  *Lexmark*, 572

U.S. at 125 (citation omitted); *see also McCollum v. Smith*, 596 F. Supp. 165, 168–69 (D.D.C. 1984) ("Furthermore, because the decision to prosecute involves consideration of numerous factors, even if this Court were to hold that the Justice Department had the jurisdiction, this would not result in the defendants' adoption of a decision to prosecute these particular cases.")

Second, even if the Court was persuaded that the USDA were likely to bring enforcement actions against the facilities at issue in the foreseeable future, there would be little reason, beyond pure speculation, to infer that the USDA would use the expanded authorities proposed by the ALDF to effectuate a pre-adjudication confiscation of any animal that is, or is likely to be, mistreated by an exhibitor, where that mistreatment is causing, or is likely to cause, an aesthetic injury to an ALDF member.  Recall that the ALDF's proposed rule would provide only that "an APHIS official *may* confiscate the animal(s)" at issue, not that any confiscations would be required.  Dkt. 35 at 8 (emphasis added).  No less than the decision whether to initiate an enforcement action in the first place, the choice to pursue confiscation as a remedy would turn on the discretion of the USDA.  *See Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1030 (D.C. Cir. 2007) (an agency has absolute discretion "in deciding how to enforce" a statutory provision).

In a further difficulty for the ALDF, even if the USDA were to elect to confiscate some of the animals mentioned in the member declarations, it is uncertain whether such confiscations would occur as a result of the increased powers proposed by the Fund's petition.  The USDA already possesses the authority to confiscate animals "found by an APHIS official to be suffering" as a result of noncompliance with federal animal welfare standards, after providing the exhibitor with the opportunity to correct the mistreatment.  9 C.F.R. § 2.129(a).  As the USDA noted in its denial letter, the incidents discussed in the ALDF's petition "involve animal suffering, and in those circumstances, [the] APHIS already has the statutory and regulatory

authority to confiscate the animals at issue." Dkt. 35 at 127. The same is true for the aesthetic injuries discussed in the declarations submitted by the ALDF to support its contention that at least one of its members has Article III standing. *See, e.g.,* Dkt. 27-6 at 4 (Andrews Decl. ¶ 14) ("The animals at [Olympic Game Farm] are suffering and need help."); Dkt. 27-11 at 22 (Gano Decl. ¶ 77) ("I'm very fearful that the animals trapped at Tiger Creek are suffering even more now than they were when I worked there."); Dkt. 27-13 at 6 (Bennett Decl. ¶ 22) ("I now feel that I have a moral obligation to do whatever I can to try to end the mistreatment of each animal at Farmers Inn."). To the extent that those animals are suffering because of their current owners' malfeasance, as the declarations claim, adopting the ALDF's proposed rule would have only a modest effect on the USDA's legal authority to confiscate them. At most, doing so would allow the Department to confiscate the animals more quickly, with fewer procedural safeguards than are contemplated by the current regulations. *Compare* 9 C.F.R. § 2.129, *with* Dkt. 35 at 8–9. But doing so would also likely invite legal challenges from the exhibitors and would implicate a host of discretionary decisions about how most effectively to deploy the Department's resources and about how best to pursue the Department's mission. As a result, the Court cannot conclude that it is "likely" that the adoption of the rule proposed by the ALDF will result in the redress of its members' injuries. To the contrary, to the extent that the USDA has declined to pursue confiscations under the existing rule, there is little reason to believe that it would take even more aggressive action under the proposed rule.

The ALDF offers several arguments in response to the USDA's attack on its associational standing, but each fails to persuade:

*First*, the Fund argues that its standing should be analyzed under the more "relaxed" standard applied to a procedural rights claim. Dkt. 30 at 8–9. It is far from clear that the

ALDF's theory of injury is properly treated as procedural, but, in any event, it would not change the standing calculus even if it were. In a procedural injury case, "a plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement" if it can "show that the government act performed without the procedure in question will cause a distinct risk to a particularized interest of the plaintiff." *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc). In such cases, the court will "relax—while not wholly eliminating—the issues of imminence and redressability." *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021) (per curiam) (citation omitted). "For causation, a plaintiff must show two links: one connecting the omitted procedural step to some substantive government decision that may have been wrongly decided because of the lack of [compliance with] that procedural requirement and one connecting that substantive decision to the plaintiff's particularized injury." *CBD v. DOI*, 144 F.4th at 304 (citation omitted and alteration in original). And for redressability, "a plaintiff need not show that compliance with the procedure *would* alter the final agency decision, but only that the agency *could* reach a different conclusion if ordered to revisit its procedural error. *Id*. (citation omitted and emphasis in original). A paradigmatic example of a procedural injury occurs when an environmental plaintiff claims that an agency took an action, such as promulgating a final rule, without engaging in the required consultation under the Endangered Species Act. *See Growth Energy*, 5 F.4th at 27. Such a plaintiff is not required to show that, had the agency fulfilled its consultation obligation, it would not have promulgated the rule—only that it might not have done so. *Id.* at 27–28.

In this case, the ALDF does not identify an "omitted procedural step" that it claims the government was required to follow before denying its petition. It does not, for example, suggest that the USDA was required to consult with another agency before announcing its decision, or

that the Department failed to follow some obligatory notice and comment process.  *Cf.*
*California v. Trump*, 613 F. Supp. 3d 231, 243 (D.D.C. 2020).  Instead, it argues that the
challenged agency decision was "arbitrary and capricious" and "not in accordance with law"
because the denial letter misinterpreted the relevant statute and otherwise "failed to consider
important aspects of the problem that were presented in the petition, offered explanations that
run directly counter to the evidence before the agency[,] . . . and is so implausible that it could
not be ascribed to a difference in view or the product of agency expertise."  Dkt. 1 at 34 (Compl.
¶¶ 129–30).  In short, the ALDF raises the type of challenge to an agency determination common
across most APA cases, rather than an invocation of a specific procedural right.  *See Motor*
*Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

　　　　The Court recognizes, however, that the distinction between procedural and substantive
challenges under the APA is not an exact one.  In *Massachusetts v. EPA*, for example, the
plaintiffs challenged the Environmental Protection Agency's denial of a petition "asking [the]
EPA to regulate greenhouse gas emissions for new motor vehicles" on the grounds (1) that it
lacked the requisite authority under the Clean Air Act and (2) that, even if it had the necessary
authority, "it would be unwise to" adopt the proposed regulation "at this time."  549 U.S. 497,
510–11 (2007) (citation omitted).  Against this backdrop, the Supreme Court held that the
plaintiffs were entitled to rely on the relaxed redressability and immediacy requirements
applicable in procedural injury cases.  *Id.* at 517–18.  Although *Massachusetts v. EPA* dealt with
a matter over which the agency asserted a wholesale lack of regulatory authority, and although
reading that decision too broadly threatens to eviscerate the distinction between procedural injury
cases, where the redressability requirement is relaxed, and substantive injury cases, where it is
not, neither the Supreme Court nor the D.C. Circuit has yet identified a clear standard.

Although the Court is skeptical that the ALDF's claims lie on the procedural side of the divide, it need not resolve this unanswered question for present purposes because the ALDF must still "show how the agency's error could affect [its] concrete interests," *CBD v. DOI*, 144 F.4th at 304 (citation omitted), and, in any event, it fails under that prong of the standing inquiry. As explained above, even if the Court were to agree with the ALDF's a-textual reading of the AWA, and even if the Court were to agree that the Department gave short shrift to the ALDF's policy arguments, the ALDF has still failed to establish that the Department's purported errors have caused or are likely to cause any member of the organization a cognizable injury. The Supreme Court "has never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest." *Florida Audubon Soc.*, 94 F.3d at 664. "In other words, unless there is a substantial probability that the substantive agency action . . . created a demonstrable risk, or caused a demonstrable increase in an existing risk, of injury to the particularized interest of the plaintiff, the plaintiff lacks standing." *Id.* at 669 (citation omitted). For the reasons explained above, the ALDF has failed to make this essential showing. To the contrary, it is wholly uncertain and speculative whether the USDA's decision here will affect the ALDF members' aesthetic injuries.

*Second*, the ALDF argues that the prospect of future USDA enforcement actions against the facilities named in its members' declarations is more than speculative, since at least one of those establishments (Tiger Creek) has received warning documents from the Department that, on the ALDF's telling, often presage subsequent enforcement actions. Dkt. 30 at 10–11. But the Fund does not controvert the Department's representation that "[the] APHIS has never initiated an enforcement proceeding against these facilities," Dkt. 28 at 18, nor does the ALDF offer any

basis to conclude that the Department is obliged or even likely to proceed with an enforcement action just because it has sent warning notices in the past. To the contrary, the warning notice that the Fund submitted with its reply brief was issued over two-and-a-half years before the Fund characterized it as a possible "harbinger" of an upcoming enforcement action. Dkt. 27-5 at 4–5 (Melrose Decl. ¶ 12); *see also* Dkt. 30-2 at 3 (Ex. B) (dated Dec. 9, 2021).

More importantly, even if the Court were to assume that there is a sufficiently high probability of some enforcement action being taken against Tiger Creek in the future, it remains entirely speculative—turning upon the USDA's discretion—whether any such future enforcement action would seek to confiscate any particular animals and, more to the point, whether the Department would conclude that the situation was sufficiently dire to invoke the extraordinary pre-hearing confiscation authority that the ALDF's proposed rule would allow, but would not require. Without more, the Court cannot conclude that it is "likely" that a favorable judgment would redress the ALDF's asserted harm. *Lexmark*, 572 U.S. at 125 (citation omitted).

*Third*, the ALDF also briefly identifies another source of potential harm to its members, stemming from USDA-regulated puppy mills. Dkt. 27 at 19 n.5. In addition to their past involvement with Cricket Hollow Zoo, the Kuehl sisters also work with rescued dogs. Dkt. 27-1 at 13–14 (T. Kuehl Decl. ¶¶ 31–32); Dkt. 27-3 at 12–13 (L. Kuehl Decl. ¶ 26–28). Lisa Kuehl adopted two dogs who were previously taken from a puppy mill in Kansas whose license was ultimately revoked by the Department. Dkt. 27-3 at 12 (L. Kuehl Decl. ¶ 27). Although the declaration is short on specifics, it does state that those rescues were "a financial and emotional investment" and that, "[w]ere [the] USDA to confiscate dogs from puppy mill situations as soon as it revokes a facility's license, the emotional burden of rescue and rehabilitation, plus associated veterinary costs, would be alleviated for me and other adopters." *Id.* at 13 (L. Kuehl

Decl. ¶ 28).  The ALDF thus argues that Lisa Kuehl has shown an "injury from the financial and emotional costs of acquiring and caring for dogs" that supports standing.  Dkt. 27 at 12 n.5; *see also* Dkt. 30 at 8.

It is doubtful that the Lisa Kuehl declaration's general references to "financial . . . investment" and "veterinary costs," Dkt. 27-3 at 13 (L. Kuehl Decl. ¶ 28), are adequately specific to qualify as an injury in fact sufficient to give rise to Article III standing, *cf. Murthy v. Missouri*, 603 U.S. 43, 67 n.7 (2024) ("The plaintiffs bear the burden to establish standing by setting forth specific facts." (citation omitted and formatting altered)).  But even if those injuries sufficed, the ALDF still would not have shown causation or redressability.  The Fund is not seeking any financial recovery in this case that might compensate Lisa Kuehl for her past expenditures related to rescue dogs.  Dkt. 1 at 35 (Compl.).  And to the degree that the Fund seeks to premise standing on a theory that the adoption of its proposed regulations might result in additional confiscations of dogs, thereby preventing Lisa Kuehl from having to expend her own resources in the future to care for rescued animals, that chain of conjecture is unduly speculative for the reasons discussed above.  The record offers no basis for the Court to conclude that it is likely that the USDA will bring any enforcement action against any particular puppy mill; that it would invoke the proposed, pre-hearing, pre-opportunity to cure confiscation authority that the ALDF proposed; and that by doing so, it would alleviate any costs that Lisa Kuehl would likely sustain in caring for rescued dogs during the interval between a preliminary and final confiscation.

The Court, accordingly, concludes that the ALDF lacks associational standing.

## B.    Organizational Standing

The ALDF also asserts organizational standing to proceed in its own right.  Dkt. 30 at 12–13.  "Like an individual, an organization can establish standing by showing 'an actual or

threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision.'" *CBD v. DOI*, 144 F.4th at 314 (quoting *Am. Anti-Vivisection Soc'y v. Dep't of Agric.*, 946 F.3d 615, 618 (D.C. Cir. 2020)). To demonstrate a qualifying injury, the organization must identify a "concrete and demonstrable injury to [its] activities that is more than simply a setback to the organization's abstract social interests." *Id.* (citation omitted). The "expenditure of resources on advocacy is not a cognizable Article III injury." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015).

In support of its claim to organizational standing, the ALDF primarily relies on a declaration submitted by its Chief Programs Officer, Kera Melrose. Dkt. 27-5 (Melrose Decl.). The declaration discusses past lawsuits that the ALDF has filed against Cricket Hollow Zoo, and it states that, because of the USDA's reluctance to confiscate animals, "[the] ALDF has been compelled to pursue alternative means of rescuing animals and rehoming them to sanctuary where they can live out their lives." *Id.* at 5–6 (Melrose Decl. ¶ 14); *see also* Dkt. 27-1 at 10–11 (T. Kuehl Decl. ¶¶ 25–26). The USDA, for its part, argues that the Melrose and other ALDF declarations show only "that [the] ALDF is expending resources on lawsuits," which does not suffice for standing. Dkt. 28 at 19.

In an arguably similar case, the D.C. Circuit has held that an organization that "has expended financial resources to investigate and respond to complaints about birds subjected to inhumane treatment," including by "expend[ing] time and resources preparing and submitting complaints to the pertinent local, state, and/or federal agencies," had standing to contest an agency's refusal to take responsibility for those birds' welfare. *PETA*, 797 F.3d at 1095–96 (citations omitted). Here, the ALDF's declarations show that the organization "litigated a string of lawsuits regarding substandard conditions at a roadside zoo in Iowa called the Cricket Hollow

24

Zoo," Dkt. 27-5 at 2–3 (Melrose Decl. ¶ 7), and that "[b]ecause [the] USDA has overly restricted

the circumstances in which it decides to confiscate animals, [the] ALDF has been compelled to

pursue alternative means of rescuing animals and rehoming them to sanctuar[ies]," including by

bringing "two federal Endangered Species Act lawsuits and one state public nuisance lawsuit

against Cricket Hollow," *id.* at 5–6 (Melrose Decl. ¶ 14).  *See also* Dkt. 27-3 at 11 (L. Kuehl

Decl. ¶ 24) (noting that she and her sister joined as co-plaintiffs with the ALDF in pursuing

claims against Cricket Hollow and challenging the USDA's renewal of Cricket Hollow's

license).

      The scope and vitality of the D.C. Circuit's decision in the *PETA* case is open to some

debate.  In that very case, Judge Millett filed a dubitante opinion, positing that the governing

D.C. Circuit precedent was "hard to reconcile with the general rule that a plaintiff's voluntary

expenditure of resources to counteract governmental action [or inaction] that only indirectly

affects the plaintiff does not support standing."  797 F.3d at 1099 (Millett, J., dubitante) (citing

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410–14 (2013)).  Judge Millett further observed

that "hinging judicial superintendence of Executive enforcement decisions on nothing more than

a group's unadorned interest in the law's purposes, combined with just a dash of volitional

counter-expenditures, would make the courts virtually continuing monitors of the wisdom and

soundness of Executive action."  *Id.* at 1103 (citation omitted).  Moreover, although some recent

D.C. Circuit precedent reads *PETA* broadly to grant standing to organizations that challenge

agency inaction that, in effect, "shift[s] to the plaintiff organization the burden to 'investigate and

respond to complaints about [animals] subjected to inhumane treatment, and/or to obtain

appropriate and necessary relief for these animals,'" *CBD v. DOI*, 144 F.4th at 315 (quoting

*PETA*, 797 F.3d at 1095–96), other precedent reads the decision more narrowly to apply only

when the organization is "denied access to an avenue for redress and [is] denied information that 'perceptibly impaired [the organization's] ability to bring [] violations to the attention of the agency charged with preventing [animal] cruelty and [to] continue to educate the public,'" *Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10, 13 (D.C. Cir. 2020) (per curiam) (second and third alterations in original); *see also Elec. Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1256 (D.C. Cir. 2018) (noting that the court concluded that PETA had standing to sue "because the USDA's inaction deprived PETA of both Animal Welfare Act information relating to birds . . . and an avenue for filing USDA complaints against research facilities using birds or exhibitors of birds.").

The Court need not step into this debate because, however *PETA* is construed, it does not support the ALDF's claim to organizational standing in this case. To start, unlike *PETA*, this case does not involve a challenge to a rule or practice that has limited the ALDF's access to "key information . . . relie[d] on to educate the public," or that has "precluded [the ALDF] from preventing cruelty to and inhumane treatment of . . . animals through its normal process of submitting USDA complaints." *PETA*, 797 F.3d at 1094 (citation omitted). To the contrary, although the ALDF's administrative petition "asked [the] USDA to issue regulations allowing outside parties to intervene in enforcement proceedings," the ALDF declined to "challenge[] that portion of the Denial Letter." Dkt. 27 at 17 n.3. Instead, the ALDF's challenge focuses on whether the USDA erred in concluding that it lacks statutory authority to confiscate animals without first finding that the animals are "suffering as a result of a failure to comply with any provision of [the AWA] or any regulation or standard issued thereunder," 7 U.S.C. § 2146(a). *See* Dkt. 1 at 33–34 (Compl. ¶¶ 126–130). That challenge is unrelated to the access to information or the availability of avenues for seeking redress for animal cruelty.

But even assuming that the ALDF has identified a concrete harm to its activities that qualifies as an injury in fact under the *PETA* line of authority, the organization still lacks organizational standing because it has failed to show that the USDA's failure to adopt its proposed rule has caused, or is likely to cause, it to suffer that injury.  Nor has it shown that its asserted injury would be redressable, even under the relaxed standard that applies in procedural injury cases.  For the reasons explained above, it is far too speculative to infer that the ALDF's asserted injury—the cost of bringing its own enforcement actions against USDA licensees that abuse animals in their care or pursuing other avenues of relief—is or will be caused by the USDA's existing regulations, which do not authorize pre-hearing or pre-opportunity-to-correct confiscations.  And, relatedly, assuming that were the Court to decide the case in the ALDF's favor and even assuming (under the relaxed standard applicable in procedural injury cases) that the USDA would adopt the ALDF's proposed rule on remand, it is still far too speculative to infer that the proposed regulation would redress the ALDF's asserted injuries.  As discussed above, given the discretionary nature of the proposed rule, the limited enforcement resources available to the USDA, the Department's limited track-record in bringing enforcement actions under its existing authorities, the equitable considerations that the Department would necessarily confront in seeking to confiscate animals prior to finding that they were suffering due to a violation of the AWA, and the risk that any licensee subject to a pre-hearing confiscation would pursue litigation, there is little reason to believe that the proposed rule, even if adopted, would obviate or even reduce the ALDF's interest in bringing its own claims.

In short, the evidence before the Court does not show (1) that the ALDF has suffered or is likely to suffer any organizational injury that is "fairly traceable" to the denial of its petition or

(2) that it is "likely" that a favorable decision here would redress any such injuries. *CBD v. DOI*, 144 F.4th at 314 (citation omitted).

*    *    *

Because the ALDF has not met its burden to establish standing in this case under either of its theories, the Court will grant summary judgment to the USDA.

**CONCLUSION**

For the foregoing reasons, the Court will **GRANT** the USDA's cross-motion for summary judgment and will **DENY** the ALDF's motion for summary judgment.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  October 24, 2025